## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDGARDO MALDONADO, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | **JURY TRIAL DEMANDED** |
| VOX MEDIA, LLC, | |
| Defendant. | |

Dated: September 15, 2025

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
       ykopel@bursor.com
       aleslie@bursor.com
       mroberts@bursor.com

*Attorneys for Plaintiff*

Plaintiff Edgardo Maldonado ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Vox Media, LLC ("Defendant"), an American mass media company, owns and operates several media and news websites, including the pop culture website, https://www.vox.com/ (the "Website").

2.      Defendant is responsible for the installation of a tracker (i.e., third-party script) into the code of its Website—namely, the PubMatic Tracker (the "Tracker").  The Tracker is operated by a separate and distinct third party: PubMatic, Inc. (the "Third Party").

3.      Through its Tracker—as integrated by Defendant—the Third Party collects from every visitor to Defendant's Website the user's internet protocol ("IP") address and other device identifier information such as device type, browser type, and unique and persistent identifiers ("Device Metadata").  The Third-Party Tracker also sets a cookie that includes a unique user identifier, which the Tracker collects on subsequent visits.

4.      Defendant and the Third Party use the data collected by the Tracker to identify and de-anonymize users, hyper-target advertisements to users, and to enrich themselves.

5.      Because the Tracker captures the Website's visitors' "routing, addressing, or signaling information," the Tracker constitutes a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  Cal. Penal Code § 638.50(b).

6.      By installing and using the Tracker and disclosing Plaintiff's IP address to the Tracker without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

7.      The allegations here are made more invasive by the entity operating the Tracker and collecting Plaintiff's and Class Members' IP Addresses and Device Metadata. PubMatic[1] is a registered data broker in California that focuses on identifying and de-anonymizing users through identity resolution services. The purpose of this is to enrich the value of Defendant's Website users by linking those users' IP addresses and Device Metadata to profiles that contain as much personal and demographic information as possible. Users are then offered up for sale with all this collated information to interested advertisers. Advertisers can then better target Website users based on these attributes and will therefore pay Defendant more to show advertisements to Defendant's users. And the Third Party shares all this data with various other entities through a process called "cookie syncing," meaning Plaintiff's and Class Member's information winds up in the hands of untold numbers of third parties without consent. All of this enriches Defendant through advertising revenue, makes the Third Party's services (*i.e.*, its Tracker) more valuable to Defendant and other customers, and strips Plaintiff and Class Members of their anonymity and privacy in the process.

8.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

---

[1] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

**THE PARTIES**

9.     Plaintiff Edgardo Maldonado is a citizen of the State of California over the age of 18, and lives in Davis, California with an intent to remain there.  Plaintiff Maldonado is therefore a resident of California.  At all relevant times, Plaintiff Maldonado was in California when he visited the Website.

10.     Defendant Vox Media, LLC is a Delaware corporation with its operational headquarters in New York City.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business at 85 Broad Street, Floor 15, New York, NY 10004.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District.

**FACTUAL ALLEGATIONS**

**I.     THE CALIFORNIA INVASION OF PRIVACY ACT**

14.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has

created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630.)

15.     As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

16.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

17.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

18.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

19.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices to Internet tracking technology.

20.     For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that

same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

21.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, *21 (N.D. Cal. Sep. 26, 2013); *see also*, *e.g.*, *Shah v. Fandom, Inc*, --- F. Supp. 3d ---, 2024 WL 4539577, *21 (N.D. Cal. Oct. 21, 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Lesh v. Cable News Network, Inc.* --- F. Supp. 3d ---, 2025 WL 563358, *3-5 (S.D.N.Y. Feb. 20, 2025) (same); *Moody v. C2 Educ. Sys. Inc.,* 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").  This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.*, 2016 WL 8200619, *19 (N.D. Cal. Aug. 12, 2016).

22.    Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

**II.    DEFENDANT VIOLATES THE CIPA**

23.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website's data is stored.  In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1**:



24.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

25.    In addition, the server's instructions cause the Tracker to be installed on a user's browser.  The Tracker then causes the browser to send identifying information—including the user's IP address and Device Metadata—to the Third Party.

26.    The Third Party's Tracker also sets a cookie corresponding with a user ID unique to the Tracker that also allows the user to be tracked across the Internet and have their information synced between multiple entities.

27.    Because, as described below, the Tracker collects users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Tracker is a pen register.

28.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Tracker on their browsers or use the Tracker.  Nor did Defendant obtain a court order before installing or using the Tracker.

### A.    The Mechanics And Privacy Implications Of IP Addresses

29.    The collection of Plaintiff's and Class Members' IP addresses through the Tracker allows the Third Party to obtain personally identifying, non-anonymized information, and reveals their geographical location and other personal information that permits the Third Party and Defendant to conduct and profit from targeted advertising, all without Plaintiff's and Class Members' consent.  This occurs every time Plaintiff and Class Members visit the Website, which they never expected or consented to, and they were injured by being tracked across multiple visits for the purpose of targeted advertising.

30.    An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[2]

---

[2] *See, e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

31.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  The IP address enables a device to communicate with another device—such as a computer's browser communicating with a server.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

       *1.     Differentiating Between Public And Private IP Addresses: Public IP Addresses Divulge A User's House Or Workplace*

32.     A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

33.     While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible.  If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

34.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

35.     A private IP address is used within an internal network and is not routable on the public internet.  The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).  Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.  For example, a home network in New York and an office network

in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

36.     The distinction between a public and private IP address is fundamental to the architecture of modern networks.  Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

37.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  The public IP address can tell you the household, and the private IP address reveals the device used.  By knowing the device used, data processors gain additional insight into which member of the relevant household or workplace is accessing the website.

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

10

38.     Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

39.     A public IP address is therefore "routing, addressing, or signaling information."

40.     A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

41.     A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

---

[3] *What's The Difference Between A Public And Private IP Address?*, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

      2.    *Advertisers Use Public IP Addresses to Target Specific Households and Data Brokers Attach IP Addresses to Comprehensive User Profiles To Identify An Individual*

42.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[5]

43.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

44.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example, for a job fair in specific city, companies can

---

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/54j8hj5b.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g., The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

send advertisements to only those in the general location of the upcoming event.[11]

45.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

46.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

47.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

48.    Moreover, "IP address targeting can help businesses to improve their overall marketing strategy."[16]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

---

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Busines*ses, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/54j8hj5b.

[15] *Id.*

[16] *Id.*

[17] *Id.*

49.    The collection of IP addresses here is particularly invasive given PubMatic's status as a data broker.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

50.    In other words, not only does the collection of IP addresses by the Third Party cause harm in and of itself, but PubMatic specifically attaches IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

51.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

52.    As alleged below, Defendant installs the Tracker on the user's browser for marketing and analytics purposes, and the Tracker collects information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the Tracker is a "pen register."

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] *Is an IP Address Personal Data?, Convesio*, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

**B.      The Tracker Is A "Pen Register"**

53.      Defendant owns and operates the relevant Website: vox.com.  The Website reports on a diverse range of topics related to entertainment and culture including movies, television, music, books, comedy, and podcasts.[20]

54.      When companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[21]

55.      Often, third-party scripts are installed on websites "for advertising purposes."[22]

56.      Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[23]

57.      Defendant has installed the Tracker's script into the code of its Website, including when Plaintiff and Class Members visited the Website.

58.      When Plaintiff and Class Members visited the Website, the Website's code—as programmed by Defendant—caused the Tracker to be installed on Plaintiff's and Class Members' browsers.  This allows the Third Party—through its Tracker—to collect Plaintiff's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

59.      The Tracker also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Party, which is meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string

---

[20] Vox, https://www.vox.com/.

[21] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[22] *Id*.

[23] *Id*.

(browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

60.     Defendant and the Third Party then use the public IP addresses, Device Metadata, and other information of Website visitors that are collected and set by the Tracker, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

61.     At no time prior to the installation and use of the Tracker on Plaintiff's and Class Members's browsers, or prior to the use of the Tracker, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Tracker.

> 1.     *The PubMatic Tracker And The Advertising Technology Companies It Cookie-Syncs With On The Website*

62.     PubMatic is a software-as-a-service company that develops the PubMatic Tracker, which it provides to website owners like Defendant for a fee. PubMatic is a registered data broker in California.[24]

63.     According to PubMatic, it is "one of the world's leading scaled digital advertising platforms" and "offer[s] more transparent advertising solutions to publishers, media buyers and

---

[24] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[25]

64.     As described in more detail below, PubMatic is a "supply side platform" that enables companies like Defendant to sell their user inventory to advertisers, thereby earning revenue and monetizing data.  To achieve this, PubMatic uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

65.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the PubMatic Tracker on the user's browser.  The PubMatic Tracker, in turn, allows PubMatic to collect and record the user's IP address and Device Metadata, as the below screenshot from Plaintiff Maldonado's browser on the Website indicates (relevant portions highlighted in a red box)[26]:

**Figure 4:**



66.     Indeed, as PubMatic admits, its Tracker "automatically collects" "Browser and Device Information, such as the IP address you use to connect to an online service; device type and model; manufacturer; operating system type and version (e.g. iOS or Android); web browser

---

[25] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

[26] All but the first two digits of Plaintiff's IP address ("76") have been redacted throughout this Complaint to protect his privacy.

type and version (e.g., Chrome or Safari); user-agent; carrier name; time zone; network connection

type (e.g., Wi-Fi or cellular); and information about our Publisher's apps and versions currently

active on a device."[27]

67.    As shown in Figure 5, the PubMatic Tracker also stores numerous cookies along

with the user's Device Metadata in the user's browser cache—including the unique identifier

KADUSERCOOKIE (highlighted in a red box) and the KRTBCOOKIE (highlighted in a green

box).

**Figure 5**:



68.    When the user subsequently visits Defendant's Website, the PubMatic Tracker

locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser,

the PubMatic Tracker causes the browser to send the cookie (the unique identifier,

"KADUSERCOOKIE" in Figure 5 above) along with the user's Device Metadata to PubMatic.

The KADUSERCOOKIE is specifically used to "uniquely identify each browser or device from

---

[27] PubMatic, Advertiser Platform Privacy Policy, https://pubmatic.com/legal/privacy-policy/#userinfowecollect

which an individual user visits our partners' websites."[28]   A general diagram of this process is pictured as Figure 6, which explains how the Website causes the PubMatic Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the cookie.

**Figure 6:**



69.     Using the KADUSERCOOKIE, IP address, and Device Metadata, PubMatic can track and identify Website users across the Internet.

70.     If the user clears his or her cookies, then the user wipes out the PubMatic Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again: (i) Defendant's server installs the PubMatic Tracker on the user's browser, (ii) the PubMatic Tracker instructs the browser to send PubMatic the user's Device Metadata, (iii) the PubMatic Tracker stores a cookie in the browser cache, and (iv) PubMatic will continue to receive the user's Device Metadata on subsequent Website visits along with the cookie transmission.

71.     In all cases, however, PubMatic receives a user's IP address, Device Metadata, and unique user ID every time its Tracker is loaded by the Website.

---

[28] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, https://pubmatic.com/legal/platform-cookie-policy/

72.    The PubMatic Tracker will also sync the information it knows about the user with various other third parties on the Website to identify the user by matching that user with any profiles PubMatic and/or these other third parties may have on the user, which are then provided by PubMatic for sale to advertisers.

(i)    <b>ID5 ID Tracker</b>

73.    For example, PubMatic syncs the KADUSERCOOKIE value with the ID5 ID Tracker owned by ID5 Technology Ltd., as Figure 7 shows (*see* text in red box).

**Figure 7:**



74.    This allows PubMatic to obtain whatever information ID5 has on the user (and vice versa). Indeed, the "id5-sync.com" value leaves little doubt that PubMatic is matching its cookies with ID5 to obtain any information ID5 has about Plaintiff (and vice versa). ID5 also enhances the information PubMatic knows about Plaintiff with information that ID5 knows about Plaintiff. Finally, ID5 enhances this user information by installing its own cookie on Plaintiff's browser for further tracking, syncing, and de-anonymization.

20

75.     In fact, ID5 boasts that its "ID5 ID" "is a next-generation universal identifier that publishers, advertisers and ad tech platforms can use to recognise users and deliver campaign objectives across different types of devices without relying on traditional identification methods (e.g. third-party cookies and MAIDs)."[29]  It helps website owners like Defendant utilize their first party data by "leveraging a variety of signals such as hashed email addresses, page URL, IP addresses, timestamps etc., as well as a machine learning algorithm" to package up audiences for marketers that will drive ad revenue.[30]  It does this with "IdentityCloud," its comprehensive suite of services.[31]

76.     According to ID5, it "provides an evolving suite of identity solutions for the digital advertising ecosystem" to "enable[e] effective advertising. [Its] technology platform enables publishers and advertisers to more effectively recognize browsers and other devices over time by generating a unique, pseudonymous ID."[32]  This helps website owners like Defendant recognize users and target them for advertisements.

77.     ID5's "Adaptive Identity" technology is "designed to solve identity challenges at scale in a fragmented ecosystem.  At its core is machine learning, which allows [ID5] to move beyond rigid rules and one-size-fits-all approaches. Instead of relying on static logics, Adaptive Identity continuously learns from behavioural patterns, environments, and outcomes, making

---

[29] ID5, https://github.com/id5io/id5-api.js/blob/master/README.md; *see also*, *First-party IDs and identity resolution methods explained,* ID5, (March 23, 2022), https://id5.io/news/first-party-ids-and-identity-resolution-methods-explained (ID5 uses "hashed email addresses and IP addresses" to "reconcile users across domains and devices.").

[30] ID5, https://github.com/id5io/id5-api.js/blob/master/README.md.

[31] *ID5 Launches IdentityCloud, the Comprehensive Identity Solution for Digital Advertising*, EXCHANGEWIRE (Oct. 21, 2021), https://www.exchangewire.com/blog/2021/10/21/id5-launches-identitycloud-comprehensive-identity-solution/.

[32] ID5, https://id5.io/platform-privacy-policy/.

identity resolution smarter, more accurate, and more resilient over time."[33]  It can follow website users "across channels, across devices, and across the ecosystem."[34]

78.    The upshot of all this is that ID5 enables website owners like Defendant to effectively sell their user inventory to advertisers in a de-anonymized, targeted format.  By syncing its tracker with PubMatic's, ID5 facilitates this goal, leveraging PubMatic's replete database of user profiles to de-anonymize and identify Website users.

79.    PubMatic, in turn, builds on its already expansive database by learning whatever ID5 knows about the Website user.  And Defendant profits from the interaction because its users can be sold to advertisers for more money, thus enriching Defendant.

### (ii)    The Trade Desk (Adsrvr) Tracker

80.    As another example, PubMatic syncs its Tracker with The Trade Desk-adsrvr Tracker—which is owned and operated by The Trade Desk, Inc.— and this allows Defendant to access a broader pool of potential buyers who use The Trade Desk's platform.

81.    As the below screenshot from Plaintiff's browser indicates, the "KADUSERCOOKIE" is being sent to The Trade Desk, and the value of the "puid" parameter below matches the value of the "KADUSERCOOKIE" in Figure 5.[35]   Indeed, the "adsrvr.org/bid/feedback/pubmatic" value leaves little doubt that PubMatic is matching its cookies with The Trade Desk (adsrvr) to obtain any information The Trade Desk has about Plaintiff (and

---

[33] ID5, https://id5.io/news/introducing-adaptive-identity-a-smarter-approach-to-addressability-for-a-connected-world.

[34] *Id*.

[35] Testing of Plaintiff's browser also reveals that The Trade Desk received his coarse geolocation coordinates and other device "fingerprints" that allowed it to more accurately target advertisements to Plaintiff.

vice versa).  The Trade Desk also enhances the information PubMatic knows about Plaintiff with information that The Trade Desk knows about Plaintiff.

**Figure 8:**



82.     The Trade Desk is a demand-side platform (explained further below) that advertisers use to "analyze[] up to 15 million ad opportunities each second to help [advertisers] optimize campaigns in real time with more flexibility and control."[36]  According to The Trade Desk, "[t]hrough its self-service, cloud-based platform, ad buyers can create, manage, and optimize digital advertising campaigns across ad formats and devices."[37]

83.     For website owners like Defendant this means they can potentially benefit from increased demand for their ad inventory.  The Trade Desk is placed on websites like Defendant's Website so it can bid on advertisers' behalf for ad impressions on those websites.

84.     The Trade Desk thus facilitates the selling of Defendant's Website users to interested advertisers by acting as a marketplace, connecting advertisers with publishers' ad

---

[36] THE TRADE DESK, https://www.thetradedesk.com/our-demand-side-platform.

[37] *The Trade Desk Launches New Media Trading Platform for the Modern Marketer*, THE TRADE DESK (July 7, 2021), https://investors.thetradedesk.com/news-and-events/news-details/2021/The-Trade-Desk-Launches-New-Media-Trading-Platform-for-the-Modern-Marketer-07-20 2021/default.aspx#:~:text=About%20The%20Trade%20Desk,Facebook%2C%20Twitter%2C%2 0and%20LinkedIn.

inventory, like Defendant's, across various formats and devices.[38]  "Advertisers can use the platform to target specific audiences based on various parameters such as demographics, interests, browsing behavior, and location. The platform also offers real-time bidding capabilities (described further below), allowing advertisers to bid on ad placements in real-time auctions."[39]

85.    Besides its real-time bidding capabilities, The Trade Desk's "Unified ID 2.0 Initiative" facilitates identifying consumers "across the open internet" and helps "create more durable audience segments for targeting and measurement."[40]  "Unified ID 2.0 leverages encrypted email and phone number data to provide a privacy-conscious, secure, and accurate identity standard for the entire digital advertising ecosystem."[41]  PubMatic combines its data with The Trade Desk's Identity Graphs built on the "ingest[ion] of billions of events" and "deterministic identifiers" capitalizing on its "sophisticated machine-learning model that can use the best data available to deliver scale and precision for targeting audiences across devices and channels."[42]

86.    In addition, The Trade Desk's "Koa AI" capabilities continually analyze ad performance data to enhance advertising campaigns by identifying and prioritizing the most valuable ad impressions in real-time.[43]  The Trade Desk boasts that "[its] AI prioritizes and selects

---

[38] AMPLITUDE, https://amplitude.com/docs/data/destination-catalog/thetradedesk#:~:text=TheTradeDesk%20allows%20advertisers%20to%20access%20a%20wide,ads%2C%20mobile%20ads%2C%20native%20ads%2C%20and%20more.

[39] Id.

[40] THETRADEDESK, https://www.thetradedesk.com/unified-id-solution-2-0.

[41] THETRADEDESK, https://unifiedid.com/.

[42] THE TRADE DESK, https://www.thetradedesk.com/resources/how-identity-graphs-are-built-the-present-and-the-future#:~:text=Read%20on%20for%20a%20breakdown,audiences%20across%20devices%20and%20channels.

[43] THETRADEDESK, https://www.thetradedesk.com/our-demand-side-platform/ai-artificial-intelligence#:~:text=Artificial%20Intelligence-,Artificial%20Intelligence,Define%20what%20you%20value.

the best-performing and most relevant inventory based on a campaign's goals, helping [advertisers] achieve the best price per impression."[44]

87.    The Trade Desk's AI capabilities also "analyze existing customer data and build lookalike audiences.  This helps brands expand reach by targeting users who share similar behaviors and characteristics with their best-performing customers."[45]

88.    The Trade Desk not only has geotargeting capabilities but the platform also "allows radius targeting around specific coordinates and even combines demographic data with geolocation for precision advertising."[46]

89.    Moreover, "[t]hrough [its] partnerships with retail media networks, The Trade Desk provides access to transaction-based targeting, allowing brands to reach shoppers based on real purchase data from major retailers."[47]

90.    The upshot of all this is that The Trade Desk enables website owners like Defendant to effectively sell their user inventory to advertisers in a de-anonymized, targeted format.

91.    Thus, when The Trade Desk allows advertisers to target Defendant's Website users—as is The Trade Desk's function as a demand-side platform—those users will receive higher bids because they can be better targeted by advertisers as a result of The Trade Desk's synchronization with Defendant.  Defendant, in turn, accesses a broader pool of potential buyers and can sell its data at the highest prices to the biggest audience.

---

[44] *Id.*

[45] IMPROVADO, https://improvado.io/blog/the-trade-desk-guide#:~:text=Customization%20and%20optimization%20control:%20TTD,align%20with%20specific%20business%20objectives.

[46] *Id.*

[47] *Id.*

92.     In sum, Defendant profits from installing The Trade Desk's tracker on its Website because its Website users like Plaintiff and the Class Members can be sold to advertisers for more money, thus enriching Defendant.

*     *     *

93.     This is a non-exhaustive list of the entities with whom PubMatic syncs its user cookies.  Suffice it to say, PubMatic is syncing its user cookies with numerous advertising technology companies like ID5 and The Trade Desk (Adsrvr) to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

94.     The PubMatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, *supra*, 684 F. Supp. 3d at 1050.

95.     Further, the PubMatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 952 (N.D. Cal. 2023).

96.     Because the PubMatic Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).  The PubMatic Tracker is also a "pen register" because its cookies are used to ascertain the identity of the user communicating with the Website and thus constitutes "addressing" information.

III.    **DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY**

97.     The collection of Plaintiff's and Class Members' personally identifying non-anonymized information by the Third Party through Defendant's installation and use of the Tracker constitutes an invasion of privacy.

98.     As alleged herein, the Tracker is designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

99.     To put the invasiveness of Defendant's violations of the CIPA into perspective, however, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

100.     In short, the import of these concepts is that: (i) PubMatic, the Third Party, is a data broker and collects user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, and unique ID values with whatever information the Third Party has on a user from other sources; (ii) the Third Party shares that information with other entities (like ID5 and The Trade Desk) to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process—where The Trade Desk acts as a DSP and PubMatic acts as an SSP.

101.     As alleged herein, the Tracker is designed to conduct targeted advertising and boost Defendant's revenue, all through its surreptitious collection of Plaintiff's and Class Members' personal information.

A.     **Data Brokers and Real-Time Bidding: The Information Economy**

   1.     *Data Brokers*

102.     While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[48] California law defines a "data broker" as "a business that knowingly collects and sells to

---

[48] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. (Cal. Civ. Code § 1798.99.80(c).)

103.    Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a), which PubMatic[49] does.

104.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference. "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers. An identity graph is used for real-time personalization and advertising targeting for millions of users."[50] This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law. An "identity graph provider" is therefore just a euphemism for "data broker."

105.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[51] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[52]

---

[49] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

[50] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

[51] SHERMAN, *supra*, at 2.

[52] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

106.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[53]

107.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[54]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[55]

108.    This data collection has grave implications for Americans' right to privacy.   For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[56]

109.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do

---

[53] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[54] SHERMAN, *supra*, at 1.

[55] *Id.*

[56] *Id.* at 9.

not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[57]

110. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[58]

//

//

//

//

//

//

//

---

[57] *Id.*

[58] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 9**:



111.    As noted above, data brokers like PubMatic are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Metadata, which are is used by data brokers to track users across the Internet.[59]   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[60]

112.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other

---

[59] *Id.* at 11.

[60] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

people like you, so they can sell those lists of like-people and generate their income.[61]

113.    In short, by collecting IP addresses and Device Metadata, data brokers like PubMatic can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

114.    As a result of Defendant's installation of the Tracker, and some of the other entities the Third Party syncs with on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers and advertising technology companies may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members).  These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable because of having their IP addresses and Device Fingerprint Information linked to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Tracker on Plaintiff's and Class Members' browsers, and thus, enabling the Third Party to collect Plaintiff's and Class Members' IP addresses and Device Metadata without consent.

### 2.    *Real-Time Bidding*

115.    So, once data brokers collect Website's users' IP addresses and Device Metadata and create or link that information to comprehensive user profiles, how do these data brokers "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

---

[61] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

116.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[62]

117.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP, which is at least one function of the PubMatic[63] Tracker here, "work[s] with website or app publishers to help them participate in the RTB process."[64]  "DSPs [which is what the The Trade Desk Tracker is[65]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[66]  And an Advertising Exchange—which PubMatic[67] also provides—"allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[68]

118.    In other words, SSPs like PubMatic provide user information to advertisers that might be interested in those users, DSPs like The Trade Desk, help advertisers select which users

---

[62] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[63] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[64] Geoghegan, *supra*.

[65] THE TRADE DESK, https://www.thetradedesk.com/our-demand-side-platform (The Trade Desk describes itself as "[t]he leading demand-side platform for data-driven advertising").

[66] Geoghegan, *supra*.

[67] *The Best Ad Exchanges for Publishers in 2025*, PLAYWIRE, https://www.playwire.com/blog/best-ad-exchanges-for-publishers#:~:text=5.,touch%20with%20customer%20service%2C%20though (listing PubMatic as a "Top Ad Exchange[] in 2025" and describing it as an "SSP that offers exchange features[.]").

[68] Geoghegan*, supra.*

to advertise and target, and PubMatic's Advertising Exchange is the platform on which all of this happens.

119.    The RTB process works as follows:

> After a user loads a website or app, an SSP [here, PubMatic] will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, The Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[69]

**Figure 10:**



---

[69] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

120.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and solicit the highest bids.  These entities receive assistance because Defendant also installs a data broker tracker (PubMatic), on its users' browsers, among others, and all these trackers sync with each other to obtain complete user profiles:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data brokers like PubMatic].  DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers … thus enabling easier linkage of the data to the user's profile in the future.[70]

**Figure 11:**



---

[70] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022), https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

121.    In other words, an SSP like PubMatic can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information each knows about that user with the information other data brokers know about that user.  If there is a match, then PubMatic will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

122.    Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers by providing those advertisers with as much information about users as possible, which it does by syncing with PubMatic, a data broker.

123.    All this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Party is able to provide about users.

124.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    (a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    (b)    "send[ing] sensitive data across geographic borders."

    (c)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[71]

---

[71] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

125.    Given PubMatic operates as a DSP here, the last point is particularly relevant, as it means PubMatic—through its Tracker—collects and discloses the Website's users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

126.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[72]

127.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[73]:

**Figure 12:**



---

[72] Geoghegan, *supra*.

[73] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

128.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against.  *Ribas v. Clark,* 38 Cal. 3d 355, 361  (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

### 3.    Cookie Syncing

129.    It should now be clear both the capabilities of the Third Party (*i.e.*, a data broker (also an SSP) who de-anonymizes users) and the reasons Defendant installs the PubMatic Tracker on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).  The final question is how does PubMatic share information with advertising technology companies like ID5 and The Trade Desk (also a DSP) to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

130.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[74] This allows entities like the Third Party to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[75]

---

[74] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[75] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

131.    Cookie syncing works as follows:

Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[76]

//

//

//

//

//

//

//

---

[76] Papadopoulos, *supra*, at 1433.

**Figure 13:**



132.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[77]

133.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[78]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[79]  But if a

---

[77] Papadopoulos, *supra*, at 1434.

[78] *Id.*

[79] *See id.*

tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[80]

134.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[81]

135.    Cookie syncing is precisely what is happening here. When the Tracker is installed on Website users' browsers, PubMatic is calling and/or syncing its cookie with other third parties on the Website (e.g., ID5 and The Trade Desk). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

*        *        *

136.    To summarize the preceeding allegations, PubMatic is a data broker that focuses on collecting as much information about Website users as possible to create comprehensive user profiles. The Third Party may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Party gleans from other sources (e.g., various data brokers and advertising technology companies) to build comprehensive profiles. Through "cookie syncing," those profiles are shared between the Third Party and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles

---

[80] *Id.*

[81] *Id.* at 1441.

are offered up for sale to interested advertisers through real-time bidding using the Third Party's Tracker, where users will command more value, the more advertisers know about a user.

137. Thus, the Third Party enriches the value Defendant's users would otherwise command by tying the data it obtains directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique IDs) with comprehensive user profiles.

138. Accordingly, Defendant is using the Tracker in conjunction with the Third Party to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Tracker and allowing the Third Party to collect as much information about Website users as possible (without consent).

139. Thus, Defendant is unjustly enriched through its installation and use of the Tracker, which causes data to be collected by the Third Party without Plaintiff's and Class Members' consent, and that enables PubMatic to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

**B.    Defendant Uses The PubMatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

140. As noted above, PubMatic is a registered data broker in California that describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[82]

---

[82] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

141.     PubMatic helps companies like Defendant monetize the data of Website users.  As noted above, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[83]

142.     To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[84]

**Figure 14:**



143.     Likewise, PubMatic provides identity resolution via the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[85]  Notably, this allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[86]

144.     Notably, PubMatic also touts its ability to integrate with multiple other third parties—including "over 75 identity and data providers"—"leverage leading identifiers" to "help

---

[83] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[84] *Id.*

[85] IDENTITY HUB, https://pubmatic.com/products/identity-hub/.

[86] *Id.*

data owners [like Defendant] drive monetization and help media buyers [*i.e.*, advertisers] drive performance."[87]   Other data brokers (Lotame[88] and LiveRamp[89]) appear in the below figure, suggesting that PubMatic syncs with them as well:

**Figure 15:**



145.    While PubMatic enables website operators like Defendant to sell their users to advertisers with a variety of characteristics, one of those characteristics is, notably, geography:

//

//

//

//

//

---

[87] *Id.*

[88] DATA BROKER REGISTRATION FOR LOTAME SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186954.

[89] DATA BROKER REGISTRATION FOR LIVERAMP, INC., https://oag.ca.gov/data-broker/registration/560496.

**Figure 16**:



146.    PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[90]  One of the ways in which PubMatic accomplishes this is by selling "auction packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[91]

147.    In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

---

[90] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages.

[91] *Id.*

148.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[92]  This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[93]

149.    Thus, when users visit Defendant's Website, PubMatic collects users' IP addresses, Device Metadata, and unique user ID (the KADUSERCOOKIE) through its PubMatic Tracker— as installed by Defendant—so that Defendant and PubMatic can identify users with PubMatic's suite of identity resolution services, sell Defendant's users to prospective advertisers, and ultimately reap substantial revenue through the programmatic advertising PubMatic assists with. All of this helps Defendant monetize its Website and maximize revenue by enabling PubMatic to collect as much information about Defendant's users as possible.

## IV.    DEFENDANT IS SUBJECT TO JURISDICTION IN CALIFORNIA

150.    Defendant purposefully directed its conduct at California residents.  Defendant took the intentional act of installing the Tracker (pen register) on its users' browsers.  This is so because Defendant programmed the code of its Website to install the Tracker, Defendant entered an agreement with for the provision of said Tracker, and Defendant used and profited off the information surreptitiously and unlawfully collected by the Third Party operating the Tracker.

151.    Defendant expressly aimed its conduct at California.  Defendant's Website relies mostly if not entirely on advertising revenue to provide its content.  As noted above, the advertising

---

[92]    *Connect    With    PubMatic's    Auction    Packages:    Ramadan*,    PUBMATIC, https://pubmatic.com/auction-packages/americas/ramadan-us/.

[93]    *Id.*

on Defendant's Website is programmatic or based on "real-time bidding," meaning Defendant generates revenue by selling or sharing Website users' data with advertisers vis-à-vis the Tracker, and advertisers pay Defendant money through the Third-Party Tracker to show specific Website users specific advertisements based on that data.

152.    When a user accesses the Website, Defendant knows the location of that user because Defendant also receives the user's IP address, and a user's IP address correlates to their approximate location.  Thus, if a California user accesses the Website, Defendant knows the user is accessing the Website from California, knows it is installing the Tracker on a California user's browser, knows that the data of California users is being shared with and sold to advertisers, and knows that it is profiting off the data of California users.

153.    Crucially, Defendant knows a user is accessing its Website from California *before* Defendant installs the Third-Party Tracker on the user's browser.  Recall the technological order of operations.  *See* Figure 1, *supra*.  *First*, the user's browser communications with Defendant's Website.  Through this transmission, Defendant learns the user's IP address, and therefore, the user's location.  *Then*, Defendant's Website—as programmed by Defendant—responds with code or instructions to install the Tracker on the user's browser.  Thus, when Defendant installs the Tracker on the user's browser, Defendant knows the location that the user is accessing the Website from.

154.    Plaintiff was among the California residents whose information was sold to advertisers, as caused by Defendant's knowing and intentional installation of the Tracker on Plaintiff's browser.  For example, as noted above, Defendant knew Plaintiff was in California when it installed the Tracker on her browser based on Plaintiff's IP address, and the Third Party

also collected Plaintiff's IP address through its Tracker, thus revealing Plaintiff's location to the Third Party.

155.    In sum, Defendant expressly aimed its conduct at California for at least the following reasons: (i) Defendant knew where Plaintiff's and other Class Members' browsers were accessing the Website from (California) "when it installed [the Tracker] on [Plaintiff's and Class Members'] device[s]"; and (ii) Defendant knowingly profited from the disclosure and sale of Californians' information through its installation and use of the Tracker. *See Briskin v. Shopify, Inc.*, 135 F.4th. 739, 746 (9th Cir. 2025).

## V.    PLAINTIFF MALDONADO'S EXPERIENCES

156.    Plaintiff Maldonado regularly visits the Website on his desktop browser and mobile telephone, as long ago as 2019 and as recently as March or April of 2025.

157.    When Plaintiff Maldonado visited the Website, the Website's code—as programmed by Defendant—caused the PubMatic Tracker to be installed on Plaintiff's browser. *See* Figs. 4-5, *supra*.

158.    Through its Tracker, the Third Party collected Plaintiff Maldonado's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Party to pervasively track Plaintiff Maldonado across multiple Website sessions and even other websites, as well as de-anonymize Plaintiff Maldonado by synchronizing his user profile amongst each other and with other entities (such as ID5, The Trade Desk, Lotame, and LiveRamp). *See* Figs. 4-5, 7-8, 15, *supra*.

159.    Defendant and the Third Party used the information collected by the Tracker to (i) identity Plaintiff Maldonado and either create a new profile of him in the Third Party's database or match Plaintiff Maldonado to a pre-existing profile (either in the Third Party's own database or

with another entity's profile), (ii) sell Plaintiff Maldonado's information to advertisers for hyper-targeted advertising based on the information collected by the Third Party on the Website and the information contained on any profiles of Plaintiff Maldonado (which are linked to Plaintiff Maldonado via the information collected by the Third Party on the Website), (iii) actually target Plaintiff Maldonado with advertisements and serve advertisements on Plaintiff Maldonado based on the information collected by the Third Party on the Website and the information contained on any profiles of Plaintiff Maldonado (which are linked to Plaintiff Maldonado via the information collected by the Third Party on the Website), (iv) de-anonymize Plaintiff Maldonado and generate revenue from the sale of Plaintiff Maldonado's information—both what is collected on the Website by the Third Party and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Party's revenue and the value of the Third Party's services.

160.    Plaintiff Maldonado did not provide his prior consent to Defendant to install or use the Tracker on his browser.  Nor did Defendant obtain a court order before installing or using the Tracker.

161.    Thus, Plaintiff Maldonado has had his privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Party's surreptitious and unconsented-to collection of Plaintiff Maldonado's data.  Accordingly, Plaintiff Maldonado has been injured by Defendant's violation of the CIPA.

## CLASS ALLEGATIONS

162.    Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all persons who accessed the Website in California and had their IP address collected by the Tracker (the "Website Class").

163.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

164.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of people.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

165.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a)    Whether Defendant violated CIPA § 638.51(a);

(b)    Whether the Tracker is a "pen register" pursuant to Cal. Penal Code § 638.50(b);

(c)    Whether Defendant sought or obtained prior consent— express or otherwise—from Plaintiff and the Class;

> (d)    Whether Defendant sought or obtained a court order for its use of the Tracker; and
>
> (e)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

166.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Tracker, which were installed and used by Defendant.

167.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

168.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

169.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

170.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

171.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

172.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

173.    The Tracker is a "pen register" because it is a "device or process" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and Device Metadata—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones.  Cal. Penal Code § 638.50(b).

174.    Likewise, the Tracker is a "pen register" because it is a "device or process" that "capture[d]" the unique user identifiers associated with the Tracker from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones.  Cal. Penal Code § 638.50(b).

175.    The unique ID set by the Tracker is also "addressing" information because it is used to tie a Website user to the Third Party's database and repository of information about the user and ascertain the user's identity.

176.    At all relevant times, Defendant installed the Third-Party Tracker—which is a pen register—on Plaintiff's and Class Members' browsers, which enabled the Third Party to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and unique user IDs.

177.    Defendant and the Third Party used the information collected by the Tracker to (i) identity Plaintiff and Class Members and either create new profiles of them in the Third Party's database or match Plaintiff and Class Members to pre-existing profiles (either in the Third Party's own database or with another entity's profile), (ii) sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Third Party on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Party on the Website), (iii) actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by the Third Party on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Party on the Website), (iv) de-anonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by the Third Party and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Party's revenue and the value of the Third Party's services.

178.    The Tracker does not collect the content of Plaintiff's and Class Members' electronic communications with the Website. *See In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

179.     Plaintiff and Class Members did not provide their prior consent for Defendant's installation or use of the Tracker.

180.     Defendant did not obtain a court order to install or use the Tracker.

181.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)     For pre- and post-judgment interest on all amounts awarded; and

(f)     For an order awarding Plaintiff and the Class their reasonable attorney's fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated: September 15, 2025                    Respectfully submitted,

                                             **BURSOR & FISHER, P.A.**


                                             By: _____
                                                     Philip L. Fraietta

Philip L. Fraietta
Yitzchak Kopel
Alec M. Leslie
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
       ykopel@bursor.com
       aleslie@bursor.com
       mroberts@bursor.com

*Attorneys for Plaintiff*